IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JAROSLAW WIELGUS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 cv 1597 |
| | ) | |
| vs. | ) | |
| | ) | |
| RYOBI TECHNOLOGIES, INC., ONE | ) | |
| WORLD TECHNOLOGIES, INC. and | ) | Magistrate Judge Kim |
| HOME DEPOT U.S.A., INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION *IN LIMINE* NO. 8**
**(Gass Testimony Regarding Prevention/Mitigation of Wielgus' Injuries)**

Defendants, Ryobi Technologies, Inc., One World Technologies, Inc. (collectively "One World") and Home Depot U.S.A., Inc. ("Home Depot"), by and through their attorneys, Johnson & Bell, Ltd., prior to the impaneling of the jury, respectfully move this Court pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993) for the entry of an order *in limine* to exclude Stephen Gass' testimony related to whether his alternative design would have prevented plaintiff's injuries, and in support thereof, state as follows:

**INTRODUCTION**

Plaintiff's expert Stephen Gass intends to offer an opinion that incorporating the SawStop technology ("SST") into the subject BTS10 would have prevented Mr. Wielgus' injuries. To prove this, Gass must be able to reliably demonstrate three elements: (1) the SST technology could have been incorporated into the subject BTS10 in 2005 (*see* defendants' motion *in limine* no. 5 to bar Gass' testimony regarding feasibility of the SST); (2) Gass must be able to reconstruct Mr. Wielgus' accident; (3) to scientifically prove that under Wielgus' accident circumstances, the technology would have prevented Wielgus' injuries.

Gass, however, is not qualified to testify regarding accident reconstruction. He has had no formal training, classes or education in accident reconstruction. Additionally, Gass has no proper experience in accident reconstruction, as he only engaged in accident reconstruction on one occasion. Further, Gass failed to conduct any meaningful testing relevant to whether his technology would have been able to stop the blade in time to prevent Wielgus' injuries. His opinion, therefore, fails short of the legal requirements and expert must satisfy under Federal Rule of Evidence 702 and the Supreme Court decision in *Daubert v. Merrill Down Pharm., In.,* 509 U.S. 579, 113 S. Ct. 2786 (1993).

## **STANDARD FOR ADMISSIBILTY**

The admissibility of expert testimony is governed by Fed. R. Evid. 702 and *Daubert.* Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (2011). Rule 702 was amended in December 2000 in order to coincide with the Supreme Court's ruling in *Daubert*, and in particular, with the "gatekeeping" function of the trial court, ensuring that, prior to the admission of expert testimony, the testimony is both relevant and reliable. *Daubert,* 509 U.S. at 589-91. While *Daubert* dealt with purely scientific testimony, this "gatekeeping" obligation has subsequently been expanded to all expert testimony offered pursuant to Rule 702. *See Kumbo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999).

From *Daubert* and Rule 702, the Seventh Circuit has developed a two-pronged framework for analyzing expert testimony. *Cummins v. Lyle Indus.,* 93 F.3d 362, 367 (7th Cir.

1996). First, the Court must determine whether the expert would testify to "valid scientific, technical, or other specialized knowledge." *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 816 (7th Cir. 2004) (citations omitted). Second, the Court "must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Id.,* (*quoting Zelinki v. Columbia 300, Inc.,* 335 F.3d 633, 640 (7th Cir. 2003)).

With respect to qualifications, an expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. To determine if a witness qualifies as an expert, a court should compare the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness' actual testimony. *Carrol v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir. 1990). For example, when an experienced truck driver and truck driving administrator sought to testify as an expert as to visibility and stopping distances in a case involving the crash of a semi-tractor trailer, the court found he was unqualified. *See Van Houten-Maynard v. ANR Pipeline Co.,* 1995 U.S. Dist. LEXIS 6978, * 7-10 (N.D. Ill. May 19, 1995). The Court stated, "[w]hile explanation of these issues may arguably help illustrate and clarify facts beyond the ken of the average juror, Williams' apparent lack of specialized knowledge in [accident reconstruction] makes him a poor candidate for expert status with regard to these issues." *Id.*

With respect to reliability, the Supreme Court has recognized that unreliable or invalid opinions cannot reach the jury because "expert testimony can be both powerful and misleading [due to] the difficulty in evaluating it." *Daubert,* 509 U.S. at 595. Accordingly, the Supreme Court in *Daubert* set forth a non-exclusive list of factors to assist the trial court in its role as "gatekeeper" when determining whether an opinion is reliable and valid. They include: "(1)

whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 869 (7th Cir. 2001) (citing *Daubert,* 509 U.S. at 593-94). From these factors, the Seventh Circuit has derived a number of factors specifically relevant to the reliability of expert testimony in accident reconstruction cases:

> When evaluating the reliability of accident reconstruction experts, court have considered such factors as whether the expert applied well-established engineering techniques to the particular materials at issue, whether the accident reconstruction methodology is based on the expert's practical experience in the area, whether novel methodology has been subject to publication, and the general acceptance of the techniques in the relevant engineering and accident analysis fields.

*Pierce v. Chcago Rail Link, L.L.C.,* 2005 U.S. Dist. LEXIS 44905, * 14 (N.D. Ill. March 15, 2005) (*citing Smith v. Ford Motor Co.,* 215 F.3d 718, 720-21 (7th Cir. 2000)). Expert testimony based on unexplained methodologies and ad hoc assumptions is unreliable. *Pierce,* 2005 U.S. Dist. LEXIS 44905 at *17.

## ARGUMENT

**A. Gass Is Not Qualified To Render Opinions Regarding Accident Reconstruction; Therefore, He Cannot Conclude That His Alternative Design Would Have Prevented Wielgus' Injury.**

As was admitted by Gass, it is vitally important to understand that the extent of the user's injury (assuming proper functioning of the SST) will depend on:

> …how fast the hand is going and how it is approaching [orientation] the blade. Is it how high the blade is relative to the -- well, that kind of controls the angle of the approach. It is basically the time that it takes to stop and the velocity of the hand radially into the teeth of the blade.

4

#2942220

(Gass Dep., Feb. 25, 2010, p. 79, **Group Exhibit 1**)[1] Thus, for Gass' testimony to be admissible on prevention/mitigation of Mr. Wielgus' injuries, he must, to a reasonable degree of probability, be able to determine the approach speed and orientation of Wielgus' hand, and given such approach speed, opine that the resulting injury to the plaintiff, more probably than not, would have been prevented or less severe than the injuries Mr. Wielgus actually sustained on the Ryobi BTS10.

Gass' lack of training and experience in accident reconstruction, however, "makes him a poor candidate for expert status." *Van-Houten-Maynard,* 1995 U.S. Dist. LEXIS 6978 at 7. Gass has no formal training in accident reconstruction, never attempted to recreate Mr. Wielgus' incident, and has only ever engaged in accident reconstruction on one occasion. (Gr. Ex. 1, Aug. 11, 2009, p. 111; Feb.16, 2011, p. 55; March 23, 2010, p. 20) Gass testified:

> Q. …Outside of SawStop, your work with SawStop, never been employed as a mechanical engineer or an electrical engineer?
> A. I don't think so.
> Q. You don't hold yourself out as an expert in biomechanics?
> A. In some general sense, no.
> Q. No formal training in accident reconstruction?
> A. No.
> Q. No certifications in accident reconstruction?
> A. No.
> Q. No education or formal training in human factors?
> A. No, I don't think so.

(Gr. Ex. 1, Aug. 11, 2009, p. 111) If Gass cannot reconstruct the accident, it necessarily follows that he cannot opine with required degree of scientific certainty that his alternative design would have prevented the accident.

---

[1] Stephen Gass' background and general expert qualifications were discussed in *Landrum v. Delta International Machinery Corp., et.al. (*August 11, 2009) (January 19, 2010)*; Scerenscko v. Ryobi Technologies, Inc., et.al,* (February 25, 2010); *Petrenko v. Ryobi Technologies, Inc., et.al.* (March 23, 2010); and *Maloney/Bernier/White/Beers/Wielgus/Stollings v. Ryobi Technologies, Inc., et.al.* (February 16, 2011). Only pages of Gass' deposition testimony cited/referred to in this motion are attached hereto as **Group Exhibit 1**.

#2942220

Typically, what an expert may lack in formal education, (s)he may be able to make up for in experience. Gass, however, was forthright in his testimony that he has only attempted to reconstruct an accident in one case and that he has not reconstructed the accident in this case. (Gr. Ex.1, Feb. 16, 2011, p. 55). Thus, Gass lacks the professional or educational background to offer testimony regarding accident reconstruction.

Gass did testify that he has talked to hundreds of woodworkers who have experienced accidents, for five to ten minutes each at various trade shows, which he believes has given him insight as to accident reconstruction on table saws. (Gr. Ex.1, Jan. 19, 2010, p. 19-20) Five to ten minute conversations are clearly not a substitute for formal training or experience. Gass also relies on his experience as a table saw manufacturer and seasoned woodworker. (*Id.* at 12) He admits that "his testimony will always come from [his] knowledge as the inventor and president of SawStop and through [his] experience there rather than based on testing [he] ha[s] done for this litigation." (Gr. Ex. 1, Feb. 25, 2010, p. 51) To say that Gass is qualified to testify as to table saw accident reconstruction or physics/mechanics of Wielgus' accident because he is a woodworker and table saw manufacturer is to say that every car manufacturer is qualified to testify as to accident reconstruction in car accident cases, or that every person who drives a car is qualified to testify as to accident reconstruction. *See Van Houten-Maynard,* 1995 U.S. Dist. LEXIS 6978 at *7 (experienced tractor trailer driver and administrator not qualified to testify as to accident reconstruction involving tractor trailers).

In sum, Gass lacks educational and professional experience in accident reconstruction. Gass claims to be qualified based on hearsay statements of table saw users and his experience as a table saw user and manufacturer. As the cases cited above illustrate, experience using a particular product, be it a car or table saw, does in and of itself, qualify an expert to testify

#2942220

6

regarding the dynamics/mechanics (accident reconstruction) of the accident and his testimony is unreliable.

> B. **Gass' Opinions Are Not The Product Of Reliable Methodologies; Therefore, He Cannot Conclude That His Alternative Design Would Have Prevented Wielgus' Injury.**

In addition to the fact that Gass lacks the necessary qualifications to reconstruct this occurrence, his opinions regarding how the incident may have happened are inadmissible because his methodology is obviously and clearly unreliable. First, it is essential to understand the circumstances of Wielgus' accident. Gass admits that he did not read the entire deposition of Mr. Wielgus, (Gr. Ex. 1, Feb. 16, 2011, p. 45) he did not view the video reenactment of the accident, (*Id.*) and he did not make any attempt to determine what caused the board used by Wielgus to jump (*Id.* at 51). In fact, at the time of the deposition, Gass did not remember a thing about how Wielgus' accident happened. (*Id.* at 45-58). Gass also admitted to putting "as little time into these [cases] as possible." (*Id.* at 46) If Gass does not understand the underlying facts of the incident, he certainly cannot opine that this technology would have prevented plaintiff's injury. With that in mind, Gass also testified:

> Q. In this case, assuming the distance from Mr. Wielgus' left hand to the spinning blade at the time of the incident was approximately four inches, do you have any opinion as to what the speed would have been, approach speed of his hand would have been in that scenario?
> A. Well, I – I – <u>I can't quantify that for you</u>. But I can say that I – I do have an opinion that it would have been low enough that SawStop would have been effective to prevent the injury because we have had reported accidents where people have slipped their hands into the blade and experienced relatively minor injuries.
> Q. …with respect to Mr. Wielgus' case at this time, you can't offer an opinion as to what the approach speed was of his hand at the time of the accident; is that fair to say?
> A. …<u>I didn't attempt to quantify it</u>. I'm expressing my opinion functionally in terms of the performance of SawStop in – in mitigating the injury.
> Q. Can you say that if SawStop had been equipped on the saw that Mr. Wielgus was operating, he would have sustained stitches or just a nick? Can you describe with

7

#2942220

      any specificity the level of injury that he would have suffered, given what you know about the facts of the occurrence?

A. I – uh –there's nothing in the facts of the occurrence that would lead me to think it was more likely to be stitches, so <u>I would think, just given sort of the overall universe of – of accidents that we've seen and the resultant injuries, that it's likely he would not have even had stitches.</u>

(Gr. Ex. 1, Feb. 16, 2011, pp. 52-53) (emphasis added)

Second, Gass has not engaged in any testing or examination of the subject BTS10 involved in this incident, because he never inspects the products subject to litigation, and is only "generally" familiar with the BTS10 (*Id.*, Feb. 25, 2010, p. 46; Feb. 16, 2011, p.43)

Finally, Gass' dispenses with any scientific methodology and instead bases his conclusions that the SST would have prevented Wielgus' injuries upon unfounded assumptions, not otherwise supported by any meaningful testing whatsoever. Gass' first unfounded assumption is that the SawStop technology is even feasible on the BTS10.[2] This is significant because the saw at issue is a lightweight, small/portable benchtop saw weighing approximately 31 lbs. and costing about $99, while the saw Gass began selling in August of 2004 is approximately 700 pound cabinet saw selling for over $4,000 fully equipped. Although Gass provides a number of ways in his expert report that the technology could be incorporated into the BTS10, Gass cannot definitely prove that it could be done because he has never designed, built, or tested such a saw. (*Id.*, March 23, 2010, pp. 133-134) In fact, no company has ever introduced a portable benchtop saw with the SawStop technology.

Gass' next unfounded assumption is that once incorporated into a portable benchtop table saw, the SST will function exactly as it does on other saws that have incorporated the SST. Gass stated in this expert report that the SST, as incorporated on SawStop, LLC's cabinet and contractor saws, stops the blade within approximately three milliseconds. (Gass' Report,

---

[2] Feasibility of SawStop technology is subject to defendants' separate motion *in limine* no. 5.

8

#2942220

**Exhibit 2**, ¶6, 11) Gass assumes that if this technology was incorporated into the BTS10, the stopping times would remain the same. There is simply no testing to support this assumption.

Furthermore, Gass has not attempted to recreate the accident in this case, and has only ever attempted to recreate an accident in one case. Yet, Gass believes that because SawStop has received numerous, so called, "finger safe recounts"[3] from persons whose hands contacted the blade in kickback/slip accidents, he knows the SawStop technology would have mitigated plaintiff's injuries in this case because there was "nothing exceptional" about how Wielgus' accident occurred. (*See* testimony cited *supra* pp.7-8; Gr. Ex. 1, March 23, 2010. p.76; Feb. 16, 2011, p. 45).

Specifically, Gass has asked customers who have experienced an accident while operating a SawStop saw to fill out a form referred to as a "finger save" recount and to return the form along with the brake cartridge that was activated at the time of the customer's accident. The hearsay statements of unknown individuals involved in varying table saw accident and limited information available on the cartridge are not a reliable methodology for Gass to rely upon in determining that his technology would have prevented plaintiff's injuries. More importantly, Gass admits that he cannot identify from the cartridge data he receives back from the users the direction/orientation of the hand. He states:

> I can – I can make a – some – I can gather some information as to the approach speed of the hand from the data. But the primary thing the resultant injury that's – that's what most telling, because <u>I can't tell the direction of the hand,</u> as we discussed, or this oblique angle issue. I can't determine that from the cartridge data.

(Gr. Ex. 1, March 23, 2010, p. 83) But the orientation/direction/how the hand is approaching the blade, even according to Gass, is a very important factor in determining the extent of the user's

---

[3] Defendants filed a separate motion *in limine* no. 7 discussing the grounds for exclusion of any evidence of "Finger Save Recounts."

9

injury. In fact, it is very important and exceptional in this case, since Mr. Wielgus left hand rolled into the blade and the top of his four fingers contacted the spinning blade (not the palm side of the hand). That being the case, the resulting injury involving the bone structure of the fingers involves different evaluation. As Gass is aware, even a saw with the SawStop technology cannot prevent amputations when a user experiences a kickback and contacts the spinning blade with the top of his finger. For example, a user of a SawStop saw experienced a kickback and contacted a spinning blade with the top of his left ring finger, which led to an amputation of his ring finger from the last joint out. (Gr. Ex. 1, Feb. 25, 2010, p. 31) That is exactly what happened with Mr. Wielgus: he experienced a kickback and the top of his four left fingers contacted the blade. Simply put, Gass' foundation ("finger save" incident reports and the cartridge data) for his opinion that Wielgus' injuries would have been "minor" (Ex. 2, ¶11), "prevented" or "mitigated" (*see* discussion *supra)* does not even come close to the standards of reliability set forth in Rule 702 and *Daubert* or even real-world. Gass has not used well-established engineering techniques and methodologies to determine that the SawStop technology would have prevented/mitigated (by how much?) Mr. Wielgus' injuries. Gass' testimony does not meet the rigorous standards of reliability set forth in Rule 702 and *Daubert,* and as such should be precluded in this case.

          Respectfully submitted,

          **JOHNSON & BELL, LTD.**

          /s/ John W. Bell
          Attorneys for defendants Ryobi Technologies, Inc.,
          One World Technologies, Inc. and Home Depot U.S.A.,Inc.

| | |
|---|---|
| John W. Bell | ARDC No. 0161934 |
| Robert R. McNamara | ARDC No. 6194965 |
| Meghan M. Sciortino | ARDC No. 6287341 |
| Alexandria L. Bell | ARDC No. 6294858 |

JOHNSON & BELL, LTD.

10

#2942220

33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
(312) 372-0770
Fax: (312) 372-9818
E-mail: bellj@jbltd.com
mcnamarar@jbltd.com
sciortinom@jbltd.com
bella@jbltd.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

**JOHNSON & BELL, LTD.**

/s/ John W. Bell
Attorneys for defendants Ryobi Technologies, Inc.,
One World Technologies, Inc. and Home Depot U.S.A.,Inc.

| | |
|---|---|
| John W. Bell | ARDC No. 0161934 |
| Robert R. McNamara | ARDC No. 6194965 |
| Meghan M. Sciortino | ARDC No. 6287341 |
| Alexandria L. Bell | ARDC No. 6294858 |

JOHNSON & BELL, LTD.
33 West Monroe Street
Suite 2700
Chicago, Illinois 60603
(312) 372-0770
Fax: (312) 372-9818
E-mail: bellj@jbltd.com
mcnamarar@jbltd.com
sciortinom@jbltd.com
bella@jbltd.com

#2942220