**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAROSLAW WIELGUS,** | ) | |
| | ) | **No. 08 CV 1597** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **RYOBI TECHNOLOGIES, INC., et al.,** | ) | |
| | ) | **July 17, 2012** |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION and ORDER**

Jaroslaw Wielgus has sued Ryobi Technologies, Inc., One World Technologies, Inc., and Home Depot, USA, Inc. (collectively, "the defendants") pursuant to this court's diversity jurisdiction, claiming that the defendants are liable under theories of negligence, strict liability, and implied warranty for hand injuries he suffered while using a tablesaw that they manufactured or sold.[1] On March 6, 2012, the parties filed a total of 41 motions in limine. This court has been grappling with the voluminous submissions in batches, grouping the motions by subject matter and issuing opinions resolving a particular group at a time. (*See* R. 248, R. 251, R. 257, R. 259.) In this fifth opinion, the court addresses the motions that are directed toward the parties' disputes over evidence regarding whether a flesh-detection technology called "SawStop" would have mitigated Wielgus's injuries. For the following reasons, the defendants' motions in limine numbers two (R. 169) and eight (R. 175) are

---

[1] The parties have consented to this court's jurisdiction. (R. 42); *see also* 28 U.S.C. § 636(c).

denied, and motions in limine numbers seven (R. 174) and nine (R. 176) are granted in part and denied in part.

## Legal Standard

Federal district courts have broad discretion in ruling on motions in limine. *See Aldridge v. Forest River, Inc.*, 635 F.3d 870, 874-75 (7th Cir. 2011). Such motions perform "a gatekeeping function and permit[] the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). The moving party bears the burden of demonstrating blanket inadmissibility. *See Mason v. City of Chicago*, 631 F.Supp.2d 1052, 1056 (N.D. Ill. 2009). Absent that showing, evidentiary rulings should be deferred until trial, where decisions can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole. *Anglin v. Sears, Roebuck & Co.*, 139 F.Supp.2d 914, 917 (N.D. Ill. 2001). "A pre-trial ruling denying a motion in limine does not automatically mean that all evidence contested in the motion will be admitted at trial," *Bruce v. City of Chicago*, No. 09 CV 4837, 2011 WL 3471074, at *1 (N.D. Ill. July 29, 2011), because the court is free to revisit evidentiary rulings as appropriate in its exercise of discretion, *see Luce v. United States*, 469 U.S. 38, 41-42 (1984).

## Analysis

At trial, the jury will be asked to decide whether the tablesaw model that caused Wielgus's injuries—the Ryobi BTS10S—was unreasonably dangerous when it left the defendants' control in 2005. *See Faucett v. Ingersoll-Rand Min. & Mach. Co.*, 960 F.2d 653, 655 (7th Cir. 1992). Wielgus's case revolves around his theory that at the time the defendants' saw was manufactured, a feasible alternative to the design existed in the form of a saw incorporating SawStop technology. SawStop—which was invented by Wielgus's core expert witness, Stephen Gass—relies on the capacitance of the human body to detect contact between human flesh and a saw blade. When the flesh-detection device is triggered, it signals the saw to brake. The result, according to Wielgus, is that accidents that might otherwise have resulted in a severe laceration or amputation will cause only a scratch or minor cut. Wielgus intends to use the testimony of Gass and other experts to show that in 2005, it was feasible to incorporate SawStop technology into tablesaws like the BTS10S, and that an alternative design incorporating flesh-detection technology would have mitigated his injuries. The defendants seek to preclude Wielgus from introducing most of this evidence.

## I.     Defendants' Motion in Limine No. 2 to Bar Reference to SawStop "Making Saws Safer"

The defendants' motion number two is denied. In this motion, the defendants seek to prevent Wielgus from introducing any evidence or making any argument to suggest "that SawStop technology, or other comparable flesh detection technology would have made the subject BTS 10 safer." (R. 169, Mot. at 1.) According to the defendants, the question for

3

the jury is whether the BTS10S was "unreasonably dangerous," not whether it could have been "made safer," and so any evidence or argument referencing making the saw "safer" by incorporating SawStop would confuse and mislead the jury. (Id. at ¶ 6.) Wielgus calls this argument "facially ludicrous." (R. 233, Pl.'s Resp. at 20.) Although the descriptor "ludicrous" probably goes too far, this court, like Wielgus, is unconvinced that any reference to SawStop making the tablesaw "safer" should be excluded on the grounds of likely juror confusion.

To prevail on his strict liability claim under Illinois law, Wielgus will have to show that the BTS10S was unreasonably dangerous when it left the defendants' control. *See Mikolajczyk v. Ford Motor Co.*, 231 Ill.2d 516, 525 (2008). Wielgus may prove that the saw was unreasonably dangerous in one of two ways. *See id.* at 526. Using what is known as the consumer expectation test, he may show that "'the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.'" *Id.* (quoting *Lamkin v. Towner*, 138 Ill.2d 510, 529 (1990)). Alternatively, under the risk-utility test, Wielgus may show that the saw's design proximately caused his injury, leaving the defendants to "'prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs.'" *Id.* at 526-27 (quoting *Lamkin*, 138 Ill.2d at 529). The risk-utility test incorporates the idea that a plaintiff may establish that a product is unreasonably dangerous by presenting "evidence of an alternative design that is 'economical, practical and effective.'" *Id.* at 525-28 (quoting *Kerns v. Engelke*, 76 Ill.2d

4

154, 162-63 (1979)).  The availability and feasibility of an alternate design is just one relevant factor by which the parties may engage the risk-utility analysis, along with the open and obvious nature of the design defect and the design's conformance with industry standards or guidelines established by industry associations, legislation, or government regulations. *Calles v. Scripto-Tokai Corp.*, 224 Ill.2d 247, 263-64 (2007).

The defendants acknowledge that Wielgus is entitled to present evidence of an alternative design to the BTS10S, but argue that whether that alternative design "is safer" than the existing saw is irrelevant because manufacturers are not required to produce "'a product which represented the ultimate in safety.'" (R. 246, Defs.' Reply at 6 (quoting *Curry v. Louis Allis Co., Inc.*, 100 Ill.App.3d 910, 916 (1st Dist. 1981)).)  They rely heavily on *Jarke v. Jackson Prods.*, 258 Ill.App.3d 718, 724-25 (1st Dist. 1994), which characterized the question of whether "the product could have been made safer" as irrelevant to the analysis of whether a product is unreasonably dangerous.  The plaintiff in *Jarke* was a welder who claimed that the manufacturers of a welding mask were strictly liable for injuries he sustained when molten slag dripped down the mask he was wearing and into his ear.  *Id.* at 720.  The court determined that the mask's lack of ear protection was an "open and obvious" condition which would preclude the plaintiff's recovery, but Jarke proposed an alternative design incorporating ear protection and argued that the defendant "was obligated to incorporate the safer design."  *Id.* at 724.  In analyzing this argument, the court acknowledged that "the law imposes no obligation on a manufacturer to render its products

5

absolutely incapable of inflicting injury on its purchaser," and noted that "'the availability of an alternative design does not translate into a legal duty in products liability.'" *Id.* at 724-25 (quoting *Artis v. Fibre Metal Prods.*, 115 Ill.App.3d 228, 233 (1983)). In other words, the *Jarke* court confirmed that "it is beyond argument that the law of products liability imposes no obligation to use a design which a plaintiff contends is preferable." *Id.* at 725.

Whether a defendant manufacturer has a legal obligation to incorporate a tort plaintiff's proposed alternative design is a separate question from whether a plaintiff should be allowed, in the context of the risk-utility analysis, to describe its proposed alternative design as "safer" than the accused product. The *Jarke* court did not speak to whether the plaintiff could argue that a proposed alternative was safer, but rather held that he could not recover for injuries stemming from an open and obvious defect just because he had pointed to a safer alternative design. *Jarke*, 258 Ill.App.3d at 725. That idea is consistent with the cases holding that whether a feasible alternative design is available is just one, non-mandatory factor to be weighed by the jury in determining under the risk-utility test whether the accused product is unreasonably dangerous. *See, e.g., Mikolajczyk*, 231 Ill.2d at 546; *Calles*, 224 Ill.2d at 263-66.

Stacked against the defendants' characterization of the *Jarke* decision is a string of cases explicitly using the term "safer" in connection with the method of establishing that a product is unreasonably dangerous through evidence of a feasible alternative design. For example, in *Calles* the Illinois Supreme Court described a policy reason for subjecting even

6

simple products to scrutiny under the risk-utility test as necessary to encourage manufacturers to adopt a "reasonable and feasible alternative design . . . that would make a product safer." 224 Ill.2d at 262. In describing why a proposed alternative must be shown to be "economical, practical and effective," the Illinois Supreme Court reasoned that "a manufacturer's product can hardly be faulted if safer alternatives are not feasible." *Kerns*, 76 Ill.2d at 163; *see also Stallings v. Black & Decker, Inc.*, 342 Ill.App.3d 676, 684 (5th Dist. 2003) (noting that a manufacturer should only be liable if the proposed "safer alternatives" were feasible). And in finding that a window-screen manufacturer was entitled to summary judgment on a design-defect claim, the Illinois Supreme Court noted that the claimant failed "to provide evidence of how the window screens' design could have been altered to create a safer screen . . . or any evidence of the form and feasibility of the alternative screen design." *Lamkin*, 138 Ill.2d at 531; *see also Staecker v. Hitachi Seiki U.S.A., Inc.*, 95 CV 0743, 1998 WL 30698, at *5 (N.D. Ill. Jan. 22, 1998) (describing relevant test as whether "some technologically feasible, safer alternative existed"). All of these cases represent the common-sense view that the alternative-feasible design factor only makes sense if the proposed alternative is better or safer than the design that injured the plaintiff. If the proposed alternative is only equally safe or less safe than the accused product, there would be no point of proposing it as an alternative.

The defendants' argument springs from their concern that if Wielgus is allowed to characterize a saw incorporating flesh-detection as "safer" than the BTS10S, the jury will be

confused into holding them liable for not producing a risk-free product. That concern can be allayed through instructions informing the jury that Illinois law does not require manufacturers to produce "the ultimate in safety" or obligate them to adopt a design preferred by the plaintiff. For all of these reasons, the defendants' motion number two is denied.

## II.    Defendants' Motion in Limine No. 7 to Bar Evidence of "Finger Save" Recounts

The defendants' motion number seven is granted in part and denied in part. In this motion, the defendants seek to preclude Wielgus's expert, Steven Gass, from discussing reports of so-called "finger saves" in support of his position that SawStop technology could have mitigated Wielgus's injuries. In 2005, SawStop began collecting reports from customers describing accidents that they believed had been avoided when the SawStop technology triggered and stopped a saw blade from cutting them. (R. 174, Ex. 1, Gass Report ¶¶ 50-51.) SawStop provided forms to its customers that a recipient could fill out in the event that the SawStop cartridge triggered, and by collecting this data, Gass amassed what he describes as a list of hundreds of "finger saves," including many reportedly involving the kind of kickback accident that led to Wielgus's injury. (Id., Ex. 1, Gass Report ¶¶ 50-51; Ex. 2, Gass Dep. at 60-61, 76.) The defendants seek to exclude any reference to the finger save recounts because, according to them, the data is inadmissible hearsay, unfairly prejudicial, and insufficiently reliable to form the foundation for Gass's proposed expert testimony.

8

This court agrees with the defendants that the data that Gass refers to as "finger save" recounts constitutes inadmissible hearsay. To the extent that Wielgus intends to introduce the customers' self-reports of averted accidents to show that the SawStop technology is effective, the reports are classic out-of-court statements introduced for the truth of the matters asserted therein. *See* Fed. R. Evid. 801(c). In many instances, the reports involve more than one layer of hearsay, because the forms conveying the customer's report are completed by a worker's employer who was not present during the accident and relied on the saw-user's account of what happened. (R. 174, Ex. 2, Gass Dep. at 54-55, Ex. 3, SawStop Reports at 280.)

Wielgus argues that the reports are nonetheless admissible under the business records exception to the hearsay rule, *see* Fed. R. Evid. 803(6), but to qualify under that exception, evidence must meet three elements: "1) the document must be prepared in the normal course of business; 2) it must be made at or near the time of the events it records; and 3) it must be based on the personal knowledge of the entrant or on the personal knowledge of an informant having a business duty to transmit the information to the entrant," *Datamatic Servs., Inc. v. United States*, 909 F.2d 1029, 1032 (7th Cir. 1990). The finger save reports arguably meet the first two elements, but not the third. Dr. Gass testified that the finger save data is derived from customers' accounts of averted accidents that they report either by returning to SawStop a form designed to convey this information or by emailing or calling SawStop. Thus in order to compile the list of finger saves, the entrant of the information at SawStop must rely on the

personal knowledge of a stranger to the business who has no duty to transmit the information. *See id.* The Seventh Circuit has explained that if the source of the information is an outsider to the business, the business records exception generally does not apply unless the outsider's statements "can be shown independently to fall within a recognized hearsay exception." *See Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000).

Wielgus nonetheless argues that the finger save data falls within the business records exception because SawStop employees are able to verify the accuracy of the customer reports by testing the cartridge that is embedded in each SawStop saw to record whether the SawStop technology triggered as a result of contact with flesh. In support of this argument, Wielgus points to *United States v. Zapata*, 871 F.2d 616, 625 (7th Cir. 1989), where the Seventh Circuit upheld the trial court's decision to admit into evidence a hotel's guest registration records which were completed by hotel guests rather than hotel employees. The court noted that the hotel's standard practice was to have an employee verify each entry made by a guest by soliciting them to show either a business card or a driver's license, and held that in light of that employee verification, the registers qualified as business records. *Id.* at 625-26. By contrast, here, the cartridges returned by the customers along with their finger save reports allowed the SawStop employees to verify, at best, only a piece of the customer's report. Although the cartridge may verify whether the saw made contact with flesh, (*see* R. 233, Resp. Ex. P, Gass Decl. ¶ 6), Wielgus has not attempted to show that it can always verify relevant details such as who made the report, under what circumstances the accident

occurred, and what part of the hand (or other body part) the saw contacted. Given this gap in the employee's ability to verify the finger save reports, this court concludes that they are insufficiently reliable to qualify for admission under the business records exception. *See Datamatic*, 909 F.2d at 1033 n.2 (distinguishing *Zapata* where evidence had not been independently verified); *see also Weir v. Crown Equip. Corp.*, 217 F.3d 453, 458-59 (7th Cir. 2000) (noting that reports collected "from a myriad of sources and in a variety of circumstances" did not fall within the business records exception).

For the same reasons, this court disagrees with Wielgus's argument that the finger save reports are independently admissible under the residual exception to the hearsay rule. *See* Fed. R. Evid. 807. Evidence is admissible under the residual exception only if it carries sufficient "circumstantial guarantee[s] of trustworthiness," *Keri v. Board of Trs. of Purdue Univ.*, 458 F.3d 620, 631 (7th Cir. 2006), as determined by such factors as "'(1) the probable motivation of the declarant in making the statement; (2) the circumstances under which it was made; and (3) the knowledge and qualifications of the declarant,'" *Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F.Supp.2d 834, 841 (N.D. Ill. 2005) (quoting *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999)). As the defendants point out, customers who report finger saves to SawStop receive in exchange a free replacement cartridge, valued at $69. (*See* R. 233, Pl.'s Resp. Ex. P, Gass Decl. ¶ 7.) That reward raises at least a question about whether the declarants are motivated by a desire to provide accurate information untainted by the desire to replace a costly part for free. And

as pointed out above, in many cases the reports are made by declarants who do not have personal knowledge of the underlying accident. Given those circumstances, and because the residual exception is meant to be narrowly construed, *see Keri*, 458 F.3d at 631, this court declines to admit the finger saves reports under Rule 807.

But the fact that the finger save reports are inadmissible on their own does not necessarily preclude Gass from relying on them in support of his expert opinion or even from referencing them in the course of the trial. Under Rule 703, an expert may form an opinion based on facts or evidence that is otherwise inadmissible so long as the facts are "of the type reasonably relied upon by experts in that particular field of expertise." *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1270 (7th Cir. 1988). At the same time, Rule 703 is not "intended to allow oblique evasions of the hearsay rule," by allowing "a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005). With that constraint in mind, the district court has great "flexibility in deciding when to permit an expert witness to testify about otherwise inadmissible facts," including the ability to allow the expert to reveal to the jury the information underlying the opinion, as long as its probative value outweighs the dangers of unfair prejudice, juror confusion, or waste of time. *Nachtsheim*, 847 F.2d at 1270-71.

12

Here, Wielgus has shown that the customer reports regarding the averted SawStop accidents are the type of information that a saw engineer would rely on to form an opinion as to the safety of the saw. As Wielgus points out, given the risks involved in testing SawStop on people in a lab, the best way to determine whether the technology is working as designed is by gathering the reports of real-world users. The Seventh Circuit has approved of the use of accident histories to support an expert opinion, *see United States v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000) (approving of arson expert's reliance on third-party descriptions of events surrounding fire because such reports are reasonably relied on by experts in that field); *see also Wallis v. Townsend Vision, Inc.*, No. 06-3227, 2009 WL 268824, at *3 (C.D. Ill. Jan. 30, 2009) (allowing expert to reference report from accident witness in rendering opinion), and despite the defendants' argument to the contrary, in the context of Gass's opinion, the probative value of the finger save data is not outweighed by its purported prejudicial impact. The data is highly probative to the extent it supports Gass's opinion that the SawStop technology performs as expected to mitigate tablesaw injuries. The only aspect of the data that could be considered unfairly prejudicial is the term "finger save," which might suggest to the jurors that each accident report involves a situation that would have resulted in an amputation but-for the SawStop technology. But the defendants will be able to neutralize that potential prejudice on cross-examination by making their point that Gass cannot necessarily predict how serious an accident would have been absent the SawStop technology.

13

For all of these reasons, the finger save data will not come in on its own at trial, but this court determines under Rule 703 that Gass is entitled to base his opinion on that data. The court will permit Gass to reference the data at trial in connection with his opinion, but to prevent a scenario where the data effectively circumvents the hearsay rule through the guise of Rule 703, the court may limit the detail with which he may delve into the information conveyed in the reports. Additionally, Gass may not refer to this data as the "finger saves" or "finger save data" during his testimony. Accordingly, the defendants' motion in limine number seven is granted in part and denied in part.

### III. Defendants' Motion in Limine No. 8 to Bar Gass's Testimony Regarding Prevention/Mitigation of Wielgus's Injuries

The defendants' motion number eight is denied. In this motion, the defendants seek to prevent Gass from offering expert testimony regarding whether Wielgus's injuries would have been prevented or mitigated had his saw been equipped with SawStop technology. Specifically, in his expert report, Gass describes Wielgus's accident and opines that his "injuries would almost certainly have been minor if the saw at issue had been redesigned to incorporate the SawStop technology because the blade would have stopped within approximately 3 milliseconds after human contact." (R. 175, Ex. 3, Gass Report ¶¶ 54-55.) According to the defendants, this opinion should be excluded because Gass is not qualified to render opinions regarding accident reconstruction and he used what they consider to be unreliable methodologies in reaching his opinion.

"In deciding whether to admit expert testimony, a district court must determine whether the expert 'had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case.'" *United States v. Kokenis*, 662 F.3d 919, 927 (7th Cir. 2011) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)). In the framework established pursuant to Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993), that means ensuring that the testimony is both relevant and reliable. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). To testify in an expert capacity, the "witness must be qualified as an expert by knowledge, skill, experience, training, or education, the expert's reasoning or methodology underlying the testimony must be scientifically reliable, and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (internal quotations and citations omitted).

This court agrees with Wielgus that experience or training in accident reconstruction is not a prerequisite to Gass's qualifications to render an opinion with respect to whether a saw equipped with SawStop would have prevented or mitigated Wielgus's injuries. Wielgus has represented that Gass does not intend to give an opinion with respect to how Wielgus's accident occurred. Rather, he intends to opine that a saw equipped with SawStop technology would have retracted in time to prevent Wielgus from experiencing a severe injury. Rule 702 dictates that an expert may be qualified based on "knowledge, skill, experience, training or education." Wielgus has shown that Gass is the inventor of SawStop and has spent countless

15

hours testing the technology. He not only has performed tests on saws in the lab—including on saws similar to the BTS10S—he has collected data to study how it performs in the field. His company has sold more than 20,000 saws equipped with SawStop, and for seven years, he has collected data from users regarding how the technology performs on the job. Based on his years of studying that data and his experience in reviewing how the SawStop technology performs, Gass is qualified to opine that the outcome of Wielgus's accident would have been different had he been using a SawStop-equipped saw. *See United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2000) (noting that "experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony"). Because he does not intend to recreate the accident for the jury, his lack of experience in accident reconstruction is not a barrier to his testimony.

Nor does this court agree with the defendants' assertion that Gass's opinion is the product of insufficiently reliable methods. Rule 702 requires an expert to "explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line" or rely on "subjective belief or speculation." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (internal quotations omitted). Although *Daubert* set forth a number of factors for trial judges to consider in gauging the reliability of expert testimony—including whether the theory can be tested and whether it has been subjected to peer review or publication—the Supreme Court has emphasized that the court "must have considerable leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152. Gass's testimony will be that the SawStop technology is effective, and that it would have worked in a situation like Wielgus's, which was a kickback accident not unlike hundreds if not thousands of others he has studied. That is not the product of a bare conclusion or speculation. Rather, it is the product of his years-long review of data regarding the saw's efficacy and his own work testing the technology in a laboratory setting, including on saws similar to the BTS10S. (R. 233, Pl.'s Resp. Ex. N, Gass Decl. ¶¶ 5-7, Ex. Q, Dwyer Decl. ¶¶ 12, 46, 51-52, 62.) With respect to his opinion regarding how SawStop would have mitigated Wielgus's injuries, the defendants have not asserted that there is any dispute with respect to the approximate velocity with which Wielgus's hand came into contact with the saw blade or the manner in which the contact occurred. Dr. Gass will opine based on his review of accidents involving SawStop technology in which other users had similar blade contact, that these users sustained only minor injuries because the technology caused the blade to retract. The defendants will be free to cross-examine him with respect to the accuracy of his opinion, but at this stage, his experience coupled with his review of other, similar accidents render his opinion sufficiently reliable to get past the *Daubert* gate-keeping phase. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents' thorough cross-examination.").

17

**V.      Defendants' Motion in Limine No. 9 to Preclude the Testimony of Kelly Mehler**

The defendants' motion number nine is granted in part and denied in part.  In motion

number nine, the defendants argue that this court should preclude Kelly Mehler from

testifying as an expert.  Wielgus intends to offer Mehler's opinion that the BTS10S has an

unsafe design because it lacks an independent riving knife and includes a poorly designed

and constructed blade guard.  (R. 176, Ex. A, Mehler Report at 4.)  Mehler also believes that

the BTS10S is defectively designed because it "does not allow for adequate blade guarding

that includes flesh-detection technology."  (Id.)  According to the defendants, Mehler—who

is a professional woodworker and teacher in the field of wood working—is not qualified to

opine regarding the safety of the BTS10S.  They also argue that his experience using and

testing various tablesaws and their safety devices is an insufficient platform from which to

construct a reliable opinion regarding either the safety of the saw's design or the feasibility

of incorporating SawStop or other flesh-detection technology.

The defendants attempt to pigeonhole the factors the court should consider in

reviewing Mehler's qualifications by insisting that he is disqualified by his lack of

professional or educational credentials in the areas of safety engineering or saw design.  But

"[t]he Rule 702 inquiry is 'a flexible one'" that gives this court "wide latitude in performing

its gate-keeping function and determining both how to measure the reliability of expert

testimony and whether the testimony itself is reliable." *Bielskis*, 663 F.3d at 894 (quoting

*Daubert*, 509 U.S. at 593-94).  And as discussed above, depending on the facts of a case, at

18

times experience and training in a field may provide a level of expertise that renders additional academic or professional credentials unnecessary. *See Conn*, 297 F.3d at 556. That is the case here. Mehler is a professional woodworker who has been teaching seminars in tablesaw safety since 1988. (R. 176, Ex. A, Mehler Report at 2.) He has written numerous articles on tablesaw safety, authored *The Tablesaw Book* (Taunton Press 1991, 2d ed. 2002), and produced a tablesaw video aimed at the consumer market. (Id.) He presents workshops at woodworking seminars to demonstrate how kickback accidents occur and to explain how blade guarding can prevent those accidents. (Id. at 2-3.) He has served on the ad-hoc working group at Underwriters Laboratory and the Standards Technical Panel for improving blade guarding since 2001, and he has consulted with a tablesaw manufacturer to help them develop more than one tablesaw model. (Id. at 2.) All of this experience renders him more than qualified to give expert testimony regarding tablesaw use, safety, and blade-guarding. And given his years-long experience with using various tablesaws and teaching about their safe use, he does not need a safety design or engineering degree to opine as to whether a saw's blade guard or safety features render a saw defectively designed. *See Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (noting that the argument that *Daubert* requires particular academic "credentials for an expert witness is radically unsound").

Because this court considers Mehler qualified to give his proposed testimony with respect to tablesaw safety, the question becomes whether the methodologies he used to come

up with his opinions are sufficiently reliable. *See Daubert*, 509 U.S. at 590, 592-93. As previously noted, the Supreme Court has emphasized that there is no "definitive checklist" for the court to engage with in considering the reliability of a proposed expert's testimony. *See Kumho Tire*, 526 U.S. at 150. And at least with respect to his proposed testimony regarding the effectiveness of the BTS10S's current blade guard, issues stemming from its lack of a riving knife, and problems with its overall quality, his opinion is grounded in reliable methodology. In his report, he describes conducting a thorough examination of the BTS10S and drawing on his considerable experience to explain how its design contributes to kickback accidents. (R. 176, Ex. A, Mehler Report at 5-8.) He describes performing " a well known 'nickel test'" to determine how well the BTS10S is tuned. (Id. at 6.) As a seasoned, expert woodworker who has made a career out of teaching others how to use tablesaws safely and out of consulting with manufacturers regarding saw design, his inspection, use, and even limited testing is enough to render reliable his opinion regarding the quality of the saw. Once again, the defendants' disagreement with Mehler's opinion with respect to the efficacy of the BTS10S's safety devices or its overall quality go more to the weight of the evidence than its admissibility, and is fair game for cross-examination. *See Gayton*, 593 F.3d at 616.

That said, Mehler's proposed testimony with respect to flesh-detection technology is a whole different kettle of fish. Mehler's report includes his opinion that the BTS10S is defectively designed in part because its blade guard does not incorporate flesh-detection

technology and that the addition of such technology "is a feasible and sensible addition."
(R. 176, Mehler Report at 4, 8.)  The only method he references as the basis for this opinion
is a rather oblique mention of his owning and having "tested and used the SawStop tablesaw
as part of public woodworking demonstrations and in preparation for professional articles."
(Id. at 8-9.)  It is hard to see how using and demonstrating the SawStop technology qualifies
him to opine that the addition of such technology to the BTS10S is feasible, or that if it "had
been a part of the tablesaw that Mr. Wielgus was using, his injury from blade contact would
have been of minimal consequence."  (Id. at 9.)  It is one thing for SawStop's inventor to
render that opinion after years of testing and tweaking the device and poring over related
safety data; it is another for a professional woodworker to do so on the basis of an
unspecified level of use of the technology.  Because Wielgus has not satisfied the court that
Mehler performed the kind of testing, accident data review, or safety analysis on SawStop
technology that might reliably support the opinions he proposes, this court agrees with the
defendants that he should be precluded from giving an opinion regarding the efficacy or
feasibility of SawStop technology or the potential impact it would have had on Wielgus's
accident.

For all of these reasons, the defendants' motion in limine number 9 is granted to the
extent that Mehler will not be permitted to testify that Wielgus's injury would have been
mitigated had he been using the SawStop technology or that flesh-detection technology is a
feasible alternative to the BTS10S's safety systems.  The motion is denied to the extent that

Mehler will be allowed to testify as to the safety of the BTS10S, the benefits of including a riving knife, and the efficacy of its blade-guarding system.

### Conclusion

For the following reasons, the defendants' motions in limine numbers two (R. 169) and eight (R. 175) are denied, and motions in limine numbers seven (R. 174) and nine (R. 176) are granted in part and denied in part.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**