## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **JAROSLAW WIELGUS,** | ) | |
| | ) | **No. 08 CV 1597** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **RYOBI TECHNOLOGIES, INC., et al.,** | ) | |
| | ) | **August 23, 2012** |
| **Defendants.** | ) | |

### MEMORANDUM OPINION and ORDER

In this diversity suit, Jaroslaw Wielgus brings claims of negligence, breach of implied warranty, and strict liability under Illinois law (R. 84), alleging that Ryobi Technologies, Inc., One World Technologies, Inc., and Home Depot, USA, Inc. (collectively, "the defendants"), are liable for hand injuries he sustained in March 2006 while using the Ryobi Model BTS10S tablesaw, a product that the defendants manufactured or sold and Wielgus contends was unreasonably dangerous when it left the defendants' control in 2005.[1] This court has been rolling out opinions resolving the parties' voluminous motions in limine in groups organized by the motions' subject matter. In this, the final such opinion in a series of eight, this court decides what are perhaps the most hard-fought of the original 41 motions in limine: those dealing with expert testimony regarding whether flesh-detection technology known as "SawStop" presented a feasible alternative to the subject tablesaw—the Ryobi BTS10S—when it left the defendants' hands in 2005. For the following reasons, defendants'

---

[1] The parties have consented to this court's jurisdiction. (R. 42); *see also* 28 U.S.C. § 636(c).

motions in limine numbers 4 and 5 are granted in part and denied in part, and motions in limine numbers 6, 19 and 25 are granted. Also, Wielgus's third motion in limine is denied without prejudice and his fourth motion in limine is granted in part and denied in part.

## Legal Standard

The purpose of motions in limine is to iron out evidentiary disputes prior to trial "to avoid the delay and occasional prejudice caused by objections and offers of proof" once the trial is underway. *See Wilson v. Williams*, 182 F.3d 562, 566 (7th Cir. 1999). Such motions "sharpen[] the focus of later trial proceedings" by performing "a gatekeeping function" and allowing "the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury" because they "would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). The moving party bears the burden of demonstrating blanket inadmissibility. *See Mason v. City of Chicago*, 631 F.Supp.2d 1052, 1056 (N.D. Ill. 2009). Federal district courts have broad discretion in resolving motions in limine, *see Aldridge v. Forest River, Inc.*, 635 F.3d 870, 874-75 (7th Cir. 2011), and may revisit preliminary rulings later as dictated by the ebb and flow of trial, *see Luce v. United States*, 469 U.S. 38, 41-42 (1984).

## Analysis

At the trial in this case the jury will be asked to decide whether the tablesaw model that caused Wielgus to suffer severe injuries was unreasonably dangerous when it left the defendants' control in 2005. *See Kelso v. Bayer Corp.*, 398 F.3d 640, 642 (7th Cir. 2005). Wielgus's case revolves around his theory that at the time the defendants manufactured the

BTS10S, a feasible alternative to the design existed in the form of a saw incorporating SawStop technology. SawStop—which was invented by Wielgus's core expert witness, Dr. Stephen Gass—relies on the capacitance of the human body to detect contact between human flesh and a saw blade. When the flesh-detection device is triggered it signals the saw to brake. The result, according to Wielgus, is that accidents that might otherwise have resulted in a severe laceration or amputation will cause only a scratch or minor cut. Wielgus intends to use the testimony of Dr. Gass and other experts to show that in 2005, it was economically and mechanically feasible to have incorporated SawStop technology into tablesaws like the BTS10S. That proposed evidence includes data regarding the value of industry-wide tablesaw sales and the societal costs of tablesaw injuries. The defendants seek to preclude Wielgus from introducing most of this evidence.

## I.    Defendants' Motion in Limine No. 4 to Bar the Testimony of Darry Robert Holt

Defendants' motion in limine number 4 is granted in part and denied in part. In this motion, the defendants ask this court to preclude Wielgus's proposed expert, Darry Robert Holt, from giving his opinions concerning design defects in the BTS10S, the causal relationship between those defects and Wielgus's accident, and the likelihood that Wielgus's injuries could have been prevented had the saw he was using been equipped with SawStop. According to the defendants, Holt's testimony does not meet the standards for expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because he is not qualified to discuss tablesaw engineering or SawStop technology and he did not employ reliable, scientific methodology in developing his opinions.

3

Federal Rule of Evidence 702—which adopts the standards set forth in *Daubert* and its progeny—dictates that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The Seventh Circuit has broken the rule down into a three-part analysis, requiring the district court to ask first whether the witness is qualified, second whether his or her methodology is scientifically reliable, and third whether the opinion is relevant in the sense that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). The goal of this analysis "is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). The burden rests with the proponent of the expert testimony to demonstrate that it satisfies this analysis by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). That said, rejecting an expert's testimony wholesale "is the exception rather than the rule, and the trial court's role as gatekeeper is not intended" to replace cross-examination and the presentation of conflicting evidence as the traditional mechanisms for highlighting the weaknesses in expert testimony. *See Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*,

4

128 F.Supp.2d 1148, 1150 (N.D. Ill. 2001) (internal quotation omitted); *see also Daubert*, 509 U.S. at 596.

The first arrow the defendants aim at Holt's testimony is their assertion that he is simply "a hired gun" with no qualifications to discuss the matters set forth in his report beyond the experience he has amassed over years of serving as a litigation consultant. It is true that this court is obligated to "ensure that it is dealing with an expert, not just a hired gun," *see Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996), but Wielgus has demonstrated that Holt's experience is more substantive than the defendants' characterization. Holt's report shows that he is a mechanical engineer and a licensed professional engineer with approximately 35 years of experience as a consulting engineer whose role it is to evaluate the safety design of products, including tablesaws. (R. 171, Ex. C, Holt Report at 1.) He has been investigating tablesaw accidents since the mid-1970's. (Id. Ex. A, Holt Dep. at 49.) In the course of his work he has tested and examined all kinds of tablesaws and he is familiar with Ryobi's entire line. (*See Stollings v. Ryobi Techs., Inc.*, 08 CV 4006, June 12, 2012, Tr. at 153.) Holt has developed a mechanism for incorporating a riving knife onto a standard tablesaw and has run tests on saws equipped with SawStop technology and analyzed SawStop prototypes to gauge the technology's efficacy. (Id. at 153-54.) In fact, counsel in a similar proceeding represented that Holt has spent "somewhere between 25 and 50 percent of his time" over the last five years testing and examining tablesaws. (Id. at 156.) His experience as a mechanical engineer who investigates best practices in product design plus his practical experience in testing alternate guarding devices

5

provide the requisite qualifications for Holt to opine regarding the mechanics of the BTS10's blade-guarding system and the risk-hazard analysis that is a standard feature of the product-design process. *See Trustees of Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Savs. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787-88 (7th Cir. 2007) (recognizing that "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience") (quotation omitted); *Tyus*, 102 F.3d at 263 (noting that "genuine expertise may be based on experience or training").

This court is not swayed by the defendants' argument that proof of his "hired gun" status can be seen in the fact that in other tablesaw cases Holt has not critiqued manufacturers' failure to incorporate a riving knife—a criticism he makes of the defendants in this case. As Wielgus points out, Holt's testimony in a given case necessarily depends on the facts surrounding the particular accident at issue, and there is nothing to prevent an expert from updating his opinion depending on new facts. Nor have the defendants shown that Holt was retained in another case to discuss the desirability or feasibility of a riving knife and in the course of doing so gave testimony inconsistent with his current opinion. And it would be fairly ironic if years of having been deemed qualified to testify on related matters by other courts were in itself sufficient to disqualify an expert from testifying in the current case. If anything, given the focus of Holt's proposed analysis on design mechanics and industry-recognized risk/hazard analysis, the fact that courts in numerous other cases have found Holt qualified to testify in the area of mechanical engineering both within and outside of the

tablesaw industry bolsters, rather than detracts from, Holt's qualifications to testify as Wielgus proposes here. *See Traharne v. Wayne/Scott Fetzer Co.*, 156 F.Supp.2d 697, 704 (N.D. Ill. 2001) (noting that in some cases "the imprimatur of judicial approval as an expert" in other instances supports a proposed expert's qualifications).

The defendants next target the methodologies Holt used to come up with his opinion, arguing that he has done nothing more than analyze the history of decisions that went into the design of the BTS10S to render a conclusory opinion. How to determine the reliability of an expert's methodology is a matter over which the court enjoys broad latitude. *Kumho Tire*, 526 U.S. at 141-42. A non-exhaustive list of relevant factors to use in the determination includes the following: "(1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). But the inquiry is flexible enough to turn on the facts of a particular case, *Kumho Tire*, 526 U.S. at 150, and an expert may show that he has met "the same standards of intellectual rigor that are demanded in their professional work" by demonstrating that they have reviewed "experimental, statistical, or other scientific data generated by others in their field," *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996). The court must resist the temptation to evaluate the opinion's correctness—a question that must be left to the jury—and focus instead on whether "the methodology underlying that testimony is sound." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). It is up to the proposed expert to explain those

methods and principles, rather than pointing to a bottom-line conclusion. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).

Here, Holt has adequately explained the methods he used to devise his opinion with respect to what he perceives as flaws in the BTS10S's blade-guard design. Holt opines that the guarding system in question is inadequate because it is not equipped with an independent riving knife.[2] (R. 171, Ex. C, Holt Report at 3.) In 2007, Holt examined and tested a Bosch 4100 tablesaw equipped with a modular-guard assembly, and in 2009 and 2010 he examined the BTS10S. (Id. at 2.) He also reviewed industry documents relating accident data, engineering treatises, studies of the causes of kickback accidents like the one Wielgus experienced, and documents produced in discovery in this case and other tablesaw lawsuits. (Id. at 2-3, 8-9.) Together with Holt's extensive experience in investigating tablesaw accidents and analyzing product design safety, Holt's examination of the BTS10S and review of relevant safety data provides a sufficient platform for his opinion regarding the benefits of an independent riving knife. *See Winters v. Fru-Con, Inc.* 498 F.3d 734, 742 (7th Cir. 2007) (noting that a proposed expert's testimony may be reliable where it relies on "the data

---

[2] In his expert report, Holt also opines that the BTS10S blade guard is insufficient because it "was long known by Ryobi to be unwieldy or unfriendly to users and typically removed and not used." (R. 171, Ex. C, Holt Report at 3.) But in its first opinion with respect to the parties' motions in limine, this court granted the defendants' motion in limine to exclude as irrelevant Holt's testimony regarding supposed deficiencies in the BTS10S that did not contribute to Wielgus's accident. *See Wielgus v. Ryobi Techs., Inc.*, No. 08 CV 1597, 2012 WL 1748156, at *5 (N.D. Ill. May 16, 2012). Accordingly, the only aspect of Holt's opinion regarding blade-guarding that is still at play is his testimony regarding the lack of an independent riving knife and the effects of the defendants' failure to incorporate SawStop.

generated by other researchers, making proper personal observations"). The defendants' motion does not include a direct attack on the methods Holt used with respect to his opinion regarding the independent riving knife, focusing instead on his risk/hazard analysis and SawStop testing. Accordingly, this court concludes that Holt's opinion with respect to the BTS10S's failure to include an independent riving knife is sufficiently reliable to pass the *Daubert* gate-keeping stage.

Holt has also provided a reliable basis for his opinion with respect to whether the defendants conducted a proper risk/hazard analysis. According to Holt, a proper risk/hazard analysis uses a matrix to assess the probability of an adverse event and then assesses the severity of the injury the adverse event might cause to determine what measures should be incorporated to protect against a hazard that cannot be designed out of a product. (R. 171, Ex. C, Holt Report at 12.) Holt opines that the defendants did not engage in a proper risk/hazard assessment, and states that if they had, they would have concluded that the residual risk of using the BTS10S's guard assembly is unacceptable. (Id. at 13.) In reaching this opinion, Holt relies on his review of formal promulgated standards in engineering handbooks and treatises, as well as his years of experience in reviewing product design safety. (Id. at 14.) The defendants characterize Holt's report in this area as doing nothing more than summarizing principles of safety engineering and then concluding that the defendants are negligent for not following them. Although it is true that expert testimony giving an opinion with respect to an ultimate legal conclusion in the case—here, whether the defendants acted negligently—is improper, *see United States v. Sinclair*, 74 F.3d 753, 757,

758 n.1 (7th Cir. 1996), that is not what Holt has done in his expert report. Instead, he outlines the industry-accepted principles of risk/hazard analysis and then describes his opinion as to whether the particular actions the defendants took lived up to those standards. (R. 171, Ex. C, Holt Report at 12-20.) He does not give an opinion as to the legal issue of negligence, but rather provides an opinion as to whether the process the defendants engaged in complies with standard practices. The defendants are free to counter that opinion with evidence of their own, *see Daubert*, 509 U.S. at 596, but nowhere has Holt provided a legal conclusion that would justify excluding his testimony outright.

Similarly, the defendants argue that Holt should not be permitted to testify with respect to the efficacy of SawStop in mitigating injuries because the testing he performed on SawStop saws is insufficiently reliable. In forming his opinion, Holt performed a number of tests to determine whether SawStop is effective in detecting contact with flesh and in braking at a speed sufficient to minimize injuries. He initially conducted tests on a SawStop prototype in 2005, testing whether ripping various types of wood with varying moisture content would impact the saw's performance. (R. 171, Ex. C, Holt Report at 23.) Holt reports experiencing no false trips or equipment component failures during those tests. (Id.) He also fed hand-held hot dogs into the saw at various speeds to test the brake engagement. (Id.) In 2008, Holt conducted additional tests on a SawStop cabinet saw, using pressure-treated boards of various sizes and levels of moisture to test ripping functioning. (Id. at 23-24.) He also used hot dogs in these tests to determine the ability of the SawStop technology to brake quickly, evaluating stop speed using a high-speed camera. (Id. at 24.) Those tests

10

verified that the SawStop technology consistently caused the blade to brake within three milliseconds of contact with the hot dog. (Id. at 25.) Based on those tests, Holt opines that the SawStop technology "can be expected to minimize injuries from blade contact under any accident scenario." (Id. at 26.)

The defendants criticize Holt's testing methods because he used a prototype contractor saw in 2005 and a heavyweight cabinet saw in 2008. According to the defendants, these saws are too physically different from the portable, lightweight BTS10S to produce any reliable results. They also argue that by 2008, the technology had greatly improved beyond the state of the art when the BTS10S was manufactured, such that the tests on the newer saws have little bearing on how the saws would have performed in 2005. That may be so (or it might not; Wielgus vehemently disagrees), but these arguments go to the weight of the testimony, and thus are best made through effective cross-examination and the presentation of contrary evidence. *See Metavante*, 619 F.3d at 762. Essentially, in arguing that Holt's tests on the 2008 saw do not bear on its efficacy in 2005, the defendants are attacking the results of his tests. That they can do at trial, but at this stage in the game, this court must focus on the methods, not the results. *See Lapsley v. Xtek, Inc.*, __ F.3d __, 2012 WL 3055865, at *1 (7th Cir. July 27, 2012) ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy."); *Winters*, 498 F.3d at 742 ("The focus of the district court's *Daubert* analysis must be solely on principles and methodology, not on the conclusions they generate." (quotation omitted)). And this court finds that Holt's extensive testing of the speed with

which a saw armed with SawStop will consistently brake in the event of flesh contact is sufficiently reliable to support his opinion regarding SawStop's effectiveness.

Most of the defendants' critique of Holt's testimony with respect to SawStop runs toward his ability to opine regarding whether it was feasible to incorporate SawStop technology. For example, they criticize Holt for admitting that he had not determined how SawStop could be incorporated into particular kinds of saws and for opining without support about the potential time frame within which a tablesaw manufacturer could incorporate the technology. But the tests Holt performed were not designed to determine feasibility; they were designed to help Holt develop an opinion with respect to whether SawStop technology works as designed to mitigate injuries like Wielgus's. It is worth pointing out that many of the points the defendants argue in criticizing Holt's methodology stem from answers he gave to deposition questions that strayed beyond the scope of his expert report. In particular, they critique his failure to run a cost-benefit analysis to show it would be worthwhile to incorporate SawStop and they highlight his response to a deposition question regarding the costs of SawStop technology in which he said that if consumers "can't afford it, they shouldn't have it." (R. 171, Mot. at 14.) But those critiques are based on a false premise: that Holt intends to endorse the mechanical feasibility of incorporating SawStop technology onto a portable tablesaw. If that were true, this court might agree with the defendants that Holt's report does not reflect that he has engaged in the kind of analysis that would allow him to give a reliable opinion with respect to feasibility. But as Wielgus has made clear, whether SawStop is a feasible alternative is a question outside the scope of Holt's proposed

testimony, which he offers only to clarify the alleged design defects in the BTS10S, the causal relationship between those defects and Wielgus's accident, and the likelihood that Wielgus's injuries could have been prevented had the saw he was using been equipped with SawStop. This court will hold Wielgus to that representation, and will bar Holt from addressing feasibility directly, or from veering too close to the subject by referencing, for example, such factors as the cost considerations in adopting SawStop to the BTS10S.

Finally, this court concludes that Holt's proposed testimony regarding the BTS10S's blade-guard design, the efficacy of SawStop, and risk-hazard analysis will all assist the jury in resolving disputed issues. *See Ervin*, 492 F.3d at 904 (stating that the trial court must ensure that the expert's proposed testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue"). With respect to his opinions regarding risk/hazard analysis, lay jurors are unlikely to be familiar with design safety analyses, and Holt's testimony will help them parse through the question of whether the defendants' design processes lived up to industry standards. His opinion regarding the efficacy of incorporating an independent riving knife or SawStop technology into a blade-guarding system will also help the jury evaluate those proposed alternative designs, a core feature of Wielgus's theory under the risk-utility analysis. For all of these reasons, the defendants' motion to exclude Holt's testimony is granted only to the extent that he offers testimony regarding the commercial or mechanical feasibility of incorporating SawStop or seeks to describe deficiencies that did not contribute to Wielgus's accident, as described in this court's first opinion on the motions in limine. In all other respects, the motion is denied.

## II. Defendants' Motion in Limine No. 5 to Bar Dr. Gass's Testimony Re: Feasibility of Flesh Detection Technology

Defendants' motion number 5 is granted in part and denied in part. In their motion, the defendants seek to exclude Wielgus's main expert, Stephen Gass, Ph.D., from testifying regarding the feasibility of SawStop as an alternative design to the BTS10S. Dr. Gass is the inventor of SawStop and the president of SawStop, LLC, a company that has manufactured thousands of tablesaws equipped with flesh-detection technology. Wielgus intends to have Dr. Gass testify at trial that the BTS10S could have been redesigned in 2005 to incorporate SawStop or other flesh-detection technology, and that if it had included that technology, Wielgus's injury would have been minor. (R. 172, Ex. 3, Gass Report ¶¶ 10-11.) This court has already denied the defendants' separate motion in limine to preclude Dr. Gass from testifying that SawStop could have mitigated Wielgus's injuries. *See Wielgus v. Ryobi Techs., Inc.*, 08 CV 1597, 2012 WL 2921450, at *7-*8 (N.D. Ill. July 17, 2012). The focus of the current motion is on the issue of whether Dr. Gass's opinions regarding the mechanical and economic feasibility of incorporating SawStop into the BTS10S meet the requirements set forth in Rule 702 and *Daubert* for the admissibility of expert testimony.

As an initial matter, the court notes that in responding to the defendants' motion in limine, Wielgus argues that under Illinois substantive law it is the defendants' burden to prove that an alternative design is *not* feasible, rather than the plaintiff's burden to show that an alternative design *is* feasible. The argument is largely beside the point. The defendants' motion in limine requires this court to determine whether Dr. Gass's opinion meets the

14

*Daubert* standards for admissibility, not whether the proposed alternative design is feasible. *See Lapsley*, __F.3d__, 2012 WL 3055865, at *12 ("Rule 702 provides a test of reliability, not of ultimate merit.")  More importantly, his argument that the defendants bear the burden of disproving feasibility does not bear fruit in the current legal landscape.  Although Wielgus cites cases for the proposition that after a risk-utility plaintiff offers proof that a product caused his injury, the burden shifts to the defendant to demonstrate that the design's benefits outweigh its risks, *see Traharne*, 156 F.Supp.2d at 712; *Staeker v. Hitachi Seiki U.S.A., Inc.*, No. 95 CV 0743, 1998 WL 30698, at *6 (N.D Ill. Jan. 22, 1998), he has not cited any cases to support the assertion that the defendants' burden includes disproving the feasibility of any alternative design proposed by the plaintiff.  A defendant is entitled to introduce evidence that no feasible alternative design exists, *see Mikolajczyk v. Ford Motor Co.*, 231 Ill.2d 516, 560 (2008), but that is not the same as saying that a defendant must disprove the feasibility of any alternative the plaintiff has proposed, regardless of the plaintiff's evidence that the alternative is feasible.  A products-liability plaintiff is not required to offer evidence of an alternative design in order to prevail under the risk-utility method, but if the plaintiff chooses to put forth an alternative design, the cases suggest that it is the plaintiff—not the defendant—who must show that it is economically, technically, and practically feasible.  *See id.* at 526 (stating that it is the plaintiff who may present "evidence of an alternative design that is economical, practical and effective" (internal quotation omitted)); *Hanson v. Baxter Healthcare Corp.*, 198 Ill.2d 420, 436 (2002) (noting that "a plaintiff may demonstrate that a product is unreasonably dangerous because of a design defect by presenting evidence of

15

an alternative design that would have prevented the injury and was feasible in terms of cost, practicality and technological possibility").

Turning to the *Daubert* inquiry that is relevant here, the court notes that the defendants do not argue that Dr. Gass is unqualified to testify regarding the feasibility of incorporating SawStop into a particular tablesaw, likely because his qualifications are ample. He holds both Bachelor of Science and Ph.D. degrees in physics. (R. 172, Ex. 3, Gass Report ¶ 1.) He invented the SawStop technology and serves as the president of SawStop, LLC, a company which pursues the development and commercialization of the relevant technology. (Id. ¶ 2.) Dr. Gass holds patents for the SawStop technology with the United States Patent and Trademark Office and with its equivalents in several foreign countries. (Id. ¶ 8.) He developed the first prototype SawStop saw in 1999 and began producing saws for inspection and field testing in 2004. (Id. ¶¶ 12, 46.) SawStop currently has developed, manufactured, and marketed three types of tablesaws that incorporate SawStop technology: industrial cabinet saws, professional cabinet saws, and contractor saws. (Id. ¶ 47.) Given the research, development, and testing that Dr. Gass has put into producing his line of SawStop saws, there is unlikely to be anyone more qualified than him to testify with respect to the process of incorporating SawStop technology into various models of saws.

The defendants argue that Dr. Gass's testimony should be precluded because, according to them, the testing he conducted to form his opinions is unreliable. Specifically, they argue that Dr. Gass's tests of SawStop technology on saws other than the BTS10S do not reliably support his feasibility opinion because the saws he tested are bigger, heavier, and

more expensive than the BTS10S. The Seventh Circuit has "'consistently recognized the importance of testing the alternative design' as a factor that the district court should consider in evaluating the reliability of the proposed expert testimony." *Winters*, 498 F.3d at 742 (quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001)). Although testing the alternative design is not a prerequisite for the expert's testimony, it "will likely be advantageous" in determining reliability, because it can assist a proposed expert in evaluating factors such as: "(1) the alternative's compatibility with existing systems, (2) relative efficiency of the current versus alternative design, (3) short and long term maintenance costs for the alternative design, (4) ability of the proposed purchaser to service and maintain the alternative design, (5) cost of installing the alternative design, and (6) change in cost to the machine." *Id.* The district court maintains significant leeway in weighing these considerations to determine the reliability of the expert's proposed testimony. *See Kumho Tire*, 526 U.S. at 152.

In his expert report and deposition testimony, Dr. Gass described a range of tests that he has performed through the years in developing SawStop products. As early as 1999, Dr. Gass developed a prototype SawStop saw, which he tested by touching the spinning blade to his own finger and to a hot dog to test the saw's capacity to detect the presence of flesh and stop in time to prevent injury. (R. 172, Ex. 3, Gass Report ¶ 12.) These are tests that he repeated as he developed new prototypes and talked with manufacturers about developing his saws. (Id. ¶¶ 17, 20, 31, 60.) In his depositions in related cases—the transcripts of which the defendants submitted in support of this motion—Dr. Gass describes

17

a variety of tests he performed to determine the feasibility of incorporating SawStop onto various saws, including benchtop saws, circular saws, and miter gauge saws. (R. 172, Ex. 4, Dec. 18, 2009 Gass Dep. at 119-122.) He describes running tests of the braking system and blade isolation testing to ensure the saws can withstand the force of a trigger of the SawStop technology. (Id. at 119-127.) Those tests confirmed that a benchtop saw could remain in a safe condition after withstanding the stopping force of the SawStop technology. (Id. Ex. 5, Aug. 11, 2009 Gass Dep. at 68-69.) All of these tests were performed to help SawStop determine the applicability of its technology to products beyond benchtop saws, including hand-held circular saws, miter saws, and band saws. (Id. Ex. 5, Jan. 19, 2010 Gass Dep. at 214.) The two concerns Dr. Gass had with adopting the technology onto smaller saws were whether the saw would jump off the table during an activation and whether the gears would sustain damage. (Id. at 215.) The tests SawStop performed left him with no uncertainty that "those issues could be addressed." (Id. at 216.)

According to the defendants, because all of Dr. Gass's testing has been performed on saws other than the BTS10S, the results do not support his opinion regarding the feasibility of incorporating SawStop into the BTS10S in 2005. For similar reasons, the defendants also argue that tests Dr. Gass performed on circular saws and miter saws cannot support his opinion regarding SawStop's feasibility with respect to the BTS10S. The defendants' argument is premised on their belief that a test of the relevant technology on anything other than an identical prototype of the proposed alternative does not count as testing at all. But the cases they rely on do not insist that the only gateway to admissibility for a feasibility

18

opinion is a test of a prototype identical to the proposed alternative. For example, in *Dhillon*, the Seventh Circuit affirmed the exclusion of a proposed expert's testimony where the expert had not conducted any tests until after he had already formed his opinion, and failed to explain how his tests on a differently designed product led to his conclusions regarding the feasibility of the proposed alternative design. 269 F.3d at 870. Similarly, in *Bourelle v. Crown Equipment Corporation*, the Seventh Circuit affirmed the exclusion of an expert who admitted not performing any scientific testing or "any risk utility type testing." 220 F.3d 532, 536-37 (7th Cir. 2000); *see also Bielskis*, 663 F.3d at 895 (affirming preclusion of expert who admitted performing no tests to support his opinion regarding a proposed alternative design); *Stanczyk v. Black & Decker, Inc.*, 836 F.Supp. 565, 567 (N.D. Ill. 1993) (excluding expert whose opinion was based on thinking about a concept for an hour). Here, Dr. Gass has been testing the capacity of various saws to withstand the force of the SawStop brake since his first prototypes were developed, long before he formed an opinion for this litigation, and he has explained how those results led to his conclusion. He explained that testing these various saw types allowed the developers at SawStop to determine that it is feasible to make various kinds of saws (including smaller saws) that perform correctly when the SawStop brake is engaged. (R. 172, Ex. 5, Jan. 19, 2010 Gass Dep. at 239.) These tests are sufficient to elevate Dr. Gass's opinion from speculation to a reliably supported hypothesis. *See Lapsley*, __F.3d__, 2012 WL 3055865, at *9. The defendants' argument that the saws Dr. Gass tested are too dissimilar from the BTS10S to support his feasibility opinion rests on

their belief that Dr. Gass's opinion is inaccurate, but this argument goes to the weight of the evidence rather than its admissibility. *See Smith*, 215 F.3d at 719.

The defendants also argue that Dr. Gass's feasibility opinion is undermined by the facts that Dr. Gass only began developing a prototype of a portable job-site saw in 2011, the job-site saw is heavier than a benchtop saw like the BTS10S, and that his prototype still has not gone on the market. In response to the defendants' argument that his opinion is based on nothing but speculation, Dr. Gass submitted a declaration making it clear that SawStop has been developing a portable benchtop tablesaw incorporating SawStop and has conducted "dozens of tests" on that saw, "including various types of extreme conditions intended to represent worst case loading of the system, and every time the mechanism has worked as expected with no damage to the components of the saw." (R. 233, Resp., Ex. N, Gass Decl. ¶¶ 3-5.) According to Dr. Gass, the portable benchtop saw will incorporate a combination gear and belt drive and will weigh about 70 pounds without its stand. (Id. ¶ 7.) Dr. Gass also explains that his decision not to enter the market for lightweight, portable tablesaws earlier in his company's development was driven not by feasibility concerns, but on a small start-up's business decision to attempt to compete initially with the bigger manufacturers only in the market of larger, higher-priced tablesaws. (Id. ¶ 3; R. 172, Ex. 3, Gass Report ¶ 46, Ex. 4, Dec. 18, 2009 Gass Dep. at 57-58, 60.) The fact that the saw has not yet been put on the market is not preclusive—the "trier of fact may conclude that the product was defective notwithstanding that the proposed design was not adopted by any manufacturer, or even considered, at the time of sale." *Blue v. Environmental Eng'g, Inc.*, 215 Ill.2d 78, 97 (2005).

Nor does this court believe that the 40-pound difference between the BTS10S and the prototype Dr. Gass has developed and tested is one that renders his feasibility opinions unreliable, although it is sure to provide the defendants with potent fodder for cross-examination. *See Daubert*, 509 U.S. at 596 (noting that cross-examination and presenting contrary evidence are "traditional and appropriate means" of attacking the merits of expert's opinion).

In addition to critiquing the types of saws Dr. Gass tested, the defendants also argue that the types of tests he ran are inadequate to support his opinion. They argue that Dr. Gass's testimony should be excluded because his tests have not been peer reviewed and are not generally accepted within the tablesaw industry. Those are two factors that *Daubert* suggests the court may consider in reviewing reliability, but they are not mandatory features of admissible testimony. *See Daubert*, 509 U.S. at 593-94. Given that Dr. Gass performed all of his tests in the context of trying to enter a competitive market for tablesaws, it is not surprising that he would treat his research and development work as confidential. The defendants have not suggested that they or other manufacturers would engage in different kinds of testing to determine the reliability of flesh-detection technology. In fact, Dr. Gass's testing has helped him evaluate many of the considerations the Seventh Circuit has highlighted as important feedback. He has been able to determine how SawStop works with an array of existing systems, and used that data to form an opinion with respect to the BTS10S. He has been able to use those tests to determine the relative efficiency of SawStop saws in preventing serious injuries from blade contact as compared to saws without SawStop.

*Winters*, 498 F.3d at 742. Although he has not determined—at least to this court's knowledge—the short and long term maintenance costs of a SawStop-equipped saw or the ability of the proposed purchaser to service and maintain the alternative design, as discussed below, he has been able to determine the approximate cost of installing the alternative design, and the change in costs to the machine. *See id.* The defendants make a better point in arguing that the number of tests and the documentation recording test results is too paltry with respect to Dr. Gass's tests of brake force, blade isolation, and capacitance testing. Other than a video recording of one of his tests, Dr. Gass has not pointed to any other documentation recording the results of the tests he performed through the years. (R. 172, Ex. 4, Dec. 18, 2009 Gass Dep. at 123,131-32.) Although this deficit of recorded data weighs against the reliability of his opinion, this court determines that on balance, the extended nature of the testing he performed, his experience in developing and analyzing the performance of SawStop technology on a variety of saws, and his success in testing a prototype tabletop saw that is in many respects similar to the BTS10S, all weigh toward allowing him to give his opinion with respect to technical feasibility.

The defendants also challenge the admissibility of Dr. Gass's opinion with respect to economic feasibility, arguing that it should be excluded because Dr. Gass did not perform any tests to support his opinion that incorporating SawStop was economically feasible back in 2005. The defendants argue that this opinion is nothing more than subjective, unsupported speculation and they fault Wielgus for not pointing to marketing studies or some other reliable data showing that consumers would have accepted the technology at the price

Dr. Gass suggests. In his expert report, Dr. Gass writes that adding SawStop to the BTS10S would cost no more than $100 to $150, a figure he calculates by adding the cost of the individual components necessary for the update. (R. 172, Ex. 3, Gass Report ¶ 57.) That figure is also based on a production of about 6,000 saws per year and would decrease with increased production. (Id.) He explained in a deposition that he calculated the costs of the components based on his experience in designing other types of saws. (Id. Ex. 4, March 23, 2010 Gass Dep. at 141.) Dr. Gass bases his opinion that consumers would be willing to pay these additional costs largely on his experience marketing other types of saws equipped with SawStop. (Id. Ex. 3, Gass Report ¶ 46.) But beyond that experience, Dr. Gass has not pointed to any studies or data that support the notion that consumers in the market for a portable, light-weight saw would be willing to pay the added costs for the SawStop upgrade. That missing data gives this court pause, and Dr. Gass will have to walk a fine line on this issue at trial. His estimation of the costs of the parts-per-saw and a general consumer willingness to pay more for higher quality may be supported by his experience in developing and selling SawStop-equipped saws, but that does not provide license to speculate as to how much consumers in the market for lower-priced saws would be willing to pay for his technology. To the extent Dr. Gass seeks to offer an opinion at trial regarding economic feasibility beyond the cost of adding SawStop to the BTS10S and his experience with respect to sales of other saws, this court will require him to provide the foundation for that opinion outside the presence of the jury. At this point, Wielgus has not pointed to the kind of data

or analysis that would support the blanket pass he seeks to give Dr. Gass on this aspect of his feasibility opinion.

Finally, the defendants argue that Dr. Gass cannot testify that incorporating SawStop into the BTS10S was practical in 2005 because the tests he performed do not support that opinion. But here they make largely the same types of arguments that this court has found unpersuasive with respect to technical feasibility: that the tested models are insufficiently similar to the BTS10S and that his test results do not support his opinion. Again this court finds that these arguments go to the weight of the evidence, and the defendants' point can be made at trial through cross-examination and the presentation of contrary evidence. *See Lapsley*, __F.3d__, 2012 WL 3055865, at *12.

As for the final *Daubert* factor, whether the evidence will assist the jury, this court easily finds that Dr. Gass's opinion is relevant with respect to the key question of whether the proposed alternative—a saw incorporating SawStop—is a feasible alternative to the BTS10S. Accordingly, this court denies defendants' motion in limine number 5 with respect to his opinions regarding technical and practical feasibility, but grants it in part with respect to the question of economic feasibility above and beyond the question of cost, unless and until Dr. Gass is able to provide the basis for an opinion that stretches farther with respect to economic feasibility.

### III.    Defendants' Motion in Limine No. 6 to Bar Dr. John Graham's Testimony

Defendants' motion in limine number 6 is granted.  In this hotly contested motion in limine, the defendants seek to exclude Wielgus's proposed expert, John Graham, Ph.D., from offering testimony regarding the "costs to society" incurred as a result of tablesaw injuries. Specifically, Dr. Graham intends to testify that there is a "strong economic case" for adopting SawStop or other flesh-detection technology.  The defendants argue that Dr. Graham's opinion should be excluded because it is unduly prejudicial, based on unreliable methods, and irrelevant to the issues the jury must resolve at trial.

Wielgus retained Dr. Graham to provide an opinion regarding whether the benefits of adopting SawStop outweigh the costs of adopting that technology.  In forming his opinion, Dr. Graham employed an Injury Cost Model ("ICM"), which is an analytical tool designed to measure the costs associated with injuries caused by consumer products and to estimate the benefits of regulations designed to reduce those costs.  (R. 173, Ex. 3, Hazard Screening Report at 17.)  The injury-associated costs include medical costs, lost wages, pain and suffering, and product liability and litigation costs.  (Id.)  Using ICM and data culled from national statistical databases, Dr. Graham plugs a number of inputs—including his calculation of the average annual cost of injury to society of tablesaw injuries ($27,730), the average rate of injury (.0035375), a discount rate of 3%, and an effectiveness rate of 90% (based on his assumption that SawStop is effective 90% of the time)—into a formula to calculate the expected injury cost for one year.  (Id., Ex. 2, Graham Report at 11.)  He then assumes that the average tablesaw in the United States has a 10-year life span, and calculates

25

an expected injury cost for ten years as $753. (Id. at 12.) That figure represents what Dr. Graham calls the "switch point"—the maximum cost increase in a typical tablesaw that can be justified under a cost-benefit analysis of safety technology like SawStop. (Id. at 10, 12.) In other words, Dr. Graham opines that if SawStop can be added to the average tablesaw for less than $753, the economic benefits to society as a whole in the reduction of injury costs would justify adopting the technology, but above that cost, the addition would not be justified. Based on Dr. Gass's testimony that SawStop can be incorporated for $100 to $150 per saw, Dr. Graham states that in his "expert opinion, the economic case for instituting automatic protection in table saws is strong." (Id. at 14.)

The defendants have not challenged Dr. Graham's qualifications to provide an analysis related to the costs and benefits to society of adopting flesh-detection technology to tablesaws, and again, this court finds his qualifications to be ample. Dr. Graham has over 30 years of experience in the fields of risk and cost-benefit analysis, during which time he published several books and more than 100 peer-reviewed journal articles regarding the theory and application of those tools. (R. 173, Ex. 2, Graham Report at 1.) After receiving his Ph.D. from Carnegie-Mellon University in 1983, Dr. Graham became instrumental in promoting the use of air-bag technology in all new cars and SUVs sold in the United States. (Id.) From 1985 to 2000, Dr. Graham served as a tenured Professor of Policy and Decision Sciences at Harvard School of Public Health, where he taught risk analysis principles and led the Harvard Center for Risk Analysis and the Harvard Injury Control Center, applying risk analysis tools to the fields of medicine and public health. (Id. at 2.) From 2001 to 2006,

26

Dr. Graham led a team of policy analysts at the White House Office of Management and Budget. (Id.) He currently serves as the Dean of the School of Public Environmental Affairs at Indiana University. (Id.) This court easily finds that Dr. Graham's educational background, scholarly work, and real-world experience in risk analysis render him qualified to provide an opinion regarding the societal costs and benefits of adopting flesh-detection technology to tablesaws.

However, the defendants persuasively argue that some of the assumptions Dr. Graham is forced to make in rendering his opinion regarding the switch-point value are not based on the kind of data that would render his opinion sufficiently reliable to pass through the *Daubert* gateway. In particular, they argue that one of the inputs he uses to calculate the switch point—the effectiveness rate—is a number that is based on nothing but speculation. In his report, Dr. Graham lists the effectiveness rate as 90%, and in explaining where this figure comes from, he states only that it "is based on expert testimony that the SawStop system will prevent injury in the vast majority of cases (Gass 2009)." (R. 173, Ex. 2, Graham Report at 11.) But he does not explain how he extrapolates from Dr. Gass's testimony that SawStop works in "the vast majority of cases," that the 90% figure is appropriate. Would 80% also represent a "vast majority"? Would 65%? Without further explanation from Dr. Graham, it appears as though he plucked the 90% number more or less out of thin air, and Wielgus has done nothing in his response to clarify or justify this 90% figure.

27

Also troubling is Dr. Graham's input regarding the number of saws in use, which he lists as eight million, citing data from the Consumer Product Safety Commission ("CPSC"). (Id.)  As the defendants point out, that figure does not account for the possibility—given Dr. Gass's testimony that incorporating SawStop technology costs from $100 to $150 per saw—that if flesh-detection technology were incorporated into saws, driving the price of saws up, the number of saws in circulation might decrease.  In other words, there may be saw users who are driven out of the market if the price of saws at the low end of the market increased, and users might replace saws less frequently given the predicted cost increases. Although the defendants highlighted this concern in their motion, Wielgus does nothing to defend those unexplained contingencies in his response.  (R. 233, Resp. at 45-46.)  Unless all of the inputs in Dr. Graham's calculation are reliable, his final switch-point calculation cannot be considered reliable.  And because Wielgus has not shown that all of the challenged inputs are based on more than speculation, this court concludes that Dr. Graham's opinion regarding the switch point does not pass the *Daubert* threshold.  *See Lewis*, 561 F.3d at 705-06 (noting that it is the burden of the proponent of expert testimony to show that it comports with Rule 702 and *Daubert*).

In addition to these reliability concerns, this court finds that the relevance of Dr. Graham's analysis of the switch-point value is questionable.  The defendants argue that this case is about whether one specific tablesaw model, the BTS10S, was unreasonably dangerous when used under the specific circumstances that were present during Wielgus's accident.   They argue that Dr. Graham's opinion essentially amounts to a policy

28

recommendation that flesh-detection technology be incorporated into all models of power saws despite the associated increased costs. Because that opinion is based on Dr. Graham's analysis of the costs of the average injury caused by the average saw over the span of an average saw's life, the defendants argue that it is too attenuated from the question whether the design benefits of the BTS10S outweigh its costs under a risk-utility theory. *See Mikolajczyk*, 231 Ill.2d at 526-27. In response, Wielgus argues that even though Dr. Graham's opinion covers all models of saws without focusing in on the BTS10S, it is relevant to help the jury weigh the costs of that design against the cost of incorporating SawStop. Essentially, the dispute turns on whether the societal costs of saws in general will help the jury to evaluate the costs and benefits of the BTS10S's design in particular.

In support of his argument that Dr. Graham's testimony is relevant, Wielgus relies exclusively on the Illinois Supreme Court's discussion in *Calles v. Scripto-Tokai Corporation*, 224 Ill.2d 247 (2007), of the factors that courts may engage with in conducting a risk-utility analysis. Among those factors—which include the manufacturer's ability to eliminate the product's unsafe features and the user's ability to avoid the danger—is "[t]he usefulness and desirability of the product—its utility to the user and to the public as a whole." *Id.* at 264. According to Wielgus, Dr. Graham's opinion regarding the switch point at which the benefits of incorporating flesh-detection technology onto the average saw outweigh its costs "go to the heart of the 'utility . . . to the public as a whole' of the existing design of the BTS10S." (R. 233, Resp. at 42 (quoting *Calles*, 224 Ill.2d at 264).) But Dr. Graham's formula does not include any inputs quantifying the societal utility of any

29

tablesaw—let alone the BTS10S. Rather, his opinion is based on quantifying the life span of an average saw, injury incidence, the number of saws in use, the average rate of injury, the average cost of injury, and the effectiveness of flesh detection. (R. 173, Ex. 2, Graham Report at 11.) In his own words, his benefit-cost analysis "can address the key question of whether the costs of an automatic safety system are greater or less than the costs of injuries that are prevented by" flesh detection. (Id. at 6.) But that comparison of costs is a separate question from any determination of the usefulness and desirability of the target product, the BTS10S, to the public. In other words, Wielgus has not shown how Dr. Graham's weighing of the costs of SawStop versus the costs of tablesaw injuries speaks in any way to the factor he relies on—the usefulness of the BTS10S to the public as a whole.

Wielgus also points to the *Calles* Court's recitation of that case's background to support his argument that Dr. Graham's opinion is relevant. In the background section, the court described the plaintiff's evidence at the summary-judgment stage as including statistics regarding the number of accidents, deaths, and injuries caused by the subject product—a utility lighter—as well as the reduction in costs to society derived from the addition of child-resistant safety devices. *See Calles*, 225 Ill.2d at 252-53. The court noted that the purpose of this evidence was to show that the defendant was aware of the lighter's dangerousness. (*Id.*) But in the analysis section of the opinion where the Illinois Supreme Court engaged the relevant factors with the evidence that had been introduced at trial, its only discussion of the safety aspects of the product was to note the likelihood and seriousness of injuries stemming from the product. *Id.* at 266. The court did not mention or struggle with the evidence

30

regarding the reduction of costs to society that would accompany additional safety features, so it is unclear whether it considered such evidence to be relevant. *Id.* And in applying the factor that Wielgus argues rules the day here—utility to society as a whole—the Supreme Court focused on the product's usefulness as an inexpensive source of fire and its convenience and safety compared to other sources of fire. *Id.* at 266-67. It did not suggest that societal costs play any role in the application of that factor. *Id.*; *cf. Todd v. Societe BIC, S.A.*, 9 F.3d 1216, 1225 (7th Cir. 1993) (Posner, J., dissenting) (noting that "the respective costs and benefits of child-resistant cigarette lighters raise difficult questions that a jury could not responsibly answer").

At bottom, Dr. Graham's opinion speaks more to the question whether a regulation requiring flesh-detection technology on all saws is sound public policy than it does to whether the design benefits of the BTS10S outweigh its risks. Based on the tenuous link between Dr. Graham's opinion and the questions the jury will have to answer, as well as the reliability concerns highlighted here, defendants' motion in limine number 6 is granted.

## IV. Defendants' Motion in Limine No. 19 to Bar Evidence of the Dollar Value of Industry-Wide Sales of Tablesaws

Defendants' motion in limine number 19 is granted. The defendants seek to bar any evidence of the value of industry-wide tablesaw sales on the grounds that the data is inadmissible hearsay, irrelevant to any question the jury will be asked to decide, and unfairly prejudicial. Wielgus offers no argument to explain why this data does not constitute hearsay, but argues that it is admissible under Rule 703 regardless of its hearsay status because

Dr. Graham relied on it in his switch-point calculation to determine the number of tablesaws in circulation and to calculate the rate of accident per saw. Similarly, the only argument Wielgus makes to establish its relevancy is that it forms the basis of Dr. Graham's opinion. Given this court's decision to exclude Dr. Graham's testimony, this court agrees with the defendants that the industry-wide value of tablesaw sales is irrelevant. Accordingly, defendants' motion in limine number 19 is granted.

## V.    Defendants' Motion in Limine No. 25 to Bar Evidence of CPSC and Dr. Gass's Calculations of the Costs of Saw Injuries

Defendants' motion in limine number 25 is granted. With this motion, the defendants seek to preclude Wielgus from introducing through Dr. Graham or Dr. Gass calculations of the total costs of all tablesaw injuries, as derived from data generated by CPSC. Specifically, CPSC used hospital data from a three-month period in 2001 to generate an estimate of the total number of annual emergency room visits that are attributable to tablesaw injuries and the societal costs of those injuries, including medical costs, work loss, pain and suffering, and litigation and insurance costs. (R. 192, Ex. 1, CPSC June 2006 Briefing Package, Section 4 & Tab B, Table 1.) CPSC calculated a total dollar value of those costs as $2.13 billion per year. (Id.) CPSC emphasized that "[t]hese estimates are indices, not actual estimates of expected injury cost reduction." (Id., Ex. 2, June 2003 Hazard Screening Report at 14 n.5.) The defendants seek to exclude this data and to preclude Wielgus's experts from relying on it because this data is irrelevant and unfairly prejudicial.

Although the public data regarding the number of tablesaw injuries each year is arguably relevant to demonstrate that the defendants had notice of the risks involved in their products, including the BTS10S, it is a much bigger stretch to say that CPSC's extrapolation of the societal costs of injuries caused by all tablesaws—which it clarifies are not "actual estimates"—are relevant to the question whether the design benefits of the BTS10S outweigh its risks. In opposing this motion, Wielgus again points to *Calles*, and argues that the Illinois Supreme Court "explicitly held that the costs to society of a product design are relevant to a proper risk-utility analysis," a conclusion he reaches because, according to him, the court "prais[ed]" the introduction of evidence of societal costs. (R. 233, Resp. at 91.) But as discussed above, the *Calles* court merely referenced in the opinion's background section the plaintiff's decision to introduce evidence of societal costs in response to the defendants' motion for summary judgment, but neither discussed nor endorsed that evidence in its analysis of the relevant factors under a risk-utility analysis. *See Calles*, 224 Ill.2d at 252-53, 266-67. This court remains unconvinced that a prediction of the total societal costs of injuries caused by all tablesaws is probative of the risks and benefits inherent in the particular design of the BTS10S. That is especially true here, where the data was presented in 2006—the year after the defendants manufactured the relevant saw. (R. 192, Ex. 1, CPSC June 2006 Briefing Package, Section 4 & Tab B, Table 1.) Given that timing, the data has little bearing even on the defendants' notice with respect to the total costs of tablesaw-related injuries.

Wielgus also presents a one-sentence argument that the data is relevant to support his experts' opinions. To the extent he means Dr. Graham, that argument is moot in light of this court's ruling excluding his testimony. To the extent he means Dr. Gass, the data does not support his opinion regarding SawStop's feasibility or ability to mitigate injuries. Instead, in his expert report Dr. Gass opines that "[a]ccidents involving table saws extract a tremendous toll in suffering on the part of the victims and they represent a significant economic cost to society for treatment and lost productivity." (R. 192, Ex. 3, Gass Report ¶ 14.) He cites CPSC's $2 billion figure and divides it by the number of tablesaws in use to determine that each saw costs society $2,000 over a ten-year life. (Id.) Comparing that figure to the "typical price of a table saw," Dr. Gass concludes that "on average, each table saw costs society at least 4 times more in injury related costs than the price of the saw itself." (Id.) But even putting aside the relevance problems inherent in a discussion of the societal costs of all tablesaw injuries, Wielgus has not explained how Dr. Gass, whose expertise stems from his role in inventing, testing, and developing SawStop technology, is qualified to give an opinion comparing societal costs of injuries with the price of tablesaws. Nor has he taken any steps to defend the reliability of this aspect of Dr. Gass's opinion, which lacks any details to support the figures he cites for the typical cost of a saw or the total annual retail market for tablesaws. *See Lewis*, 561 F.3d at 705 (noting that the burden rests with the proponent of expert testimony to demonstrate that it passes muster under *Daubert*).

Given the serious doubts this court harbors with respect to the CPSC data regarding the total societal costs of tablesaw injuries, this court agrees with the defendants that its

probative value is significantly outweighed by its unfairly prejudicial effect. *See* Fed. R. Evid. 403. Wielgus's complaint does not include a request for punitive damages, but presenting the jury with the $2.13 billion figure runs the risk that the jury will seek to punish the defendants for injuries that are wholly unrelated to Wielgus's. That the figure is based on all tablesaw injuries is also likely to confuse the jury with respect to the cost of BTS10S-related injuries, a figure that (as far as this court can tell) Wielgus has not determined. For these reasons, defendants' motion in limine number 25 is granted.

## VI. Plaintiff's Third Motion in Limine to Preclude Defendants From Making Certain Arguments Concerning Flesh-Detection Technology

Wielgus's third motion in limine is denied without prejudice. With this motion, Wielgus seeks to prevent the defendants from making certain arguments with respect to flesh-detection technology generally or SawStop in particular. The motion centers on two arguments. First, Wielgus argues that the defendants should be precluded from arguing that SawStop would not have mitigated Wielgus's injuries and from submitting any evidence relating to the costs of incorporating SawStop onto the BTS10S. In response, the defendants focus on the arguments this court considered and rejected in resolving their motion in limine to prevent Dr. Gass from testifying regarding SawStop's ability to mitigate injuries. They argue that none of the experts here, including their own expert, Peter Domeny, are qualified to opine regarding mitigation. Because it appears that the defendants do not intend to present any evidence regarding injury mitigation, this aspect of Wielgus's motion is moot for now. Wielgus will remain free to resurrect his objection at trial should the defendants offer

35

evidence to rebut Dr. Gass's opinion regarding the likelihood that SawStop would have mitigated Wielgus's injuries.

The second component of Wielgus's motion is his argument that the defendants should be foreclosed from offering any evidence regarding the costs of incorporating SawStop onto the BTS10S because, according to him, the defendants did not produce any evidence in response to his discovery request that they produce any documents "relating to the costs of table saws hazard avoidance systems or other mitigation systems, including but not limited to SawStop technology." (R. 207, Ex. C, Request No. 25.) In response the defendants assert that because Wielgus bears the burden of demonstrating that his proposed alternative design is economically feasible, *see Mikolajczyk*, 231 Ill.2d at 526, they do not intend to submit any affirmative evidence concerning SawStop's costs. But they do intend to have Domeny rebut Dr. Gass's anticipated testimony regarding the costs of incorporating SawStop. Specifically, Domeny writes in his report the following:

> The economic impact of incorporating the SawStop system calculated by Dr. Gass is either erroneous or a fabrication. The actual wholesale cost numbers are more than 2x-3x higher. No SawStop currently on the market sell for less than $1500 and many components of these saws sell for more than the cost of a complete BTS10S table saw.

(R. 207, Ex. F, Domeny Report at 9.) Without making an explicit *Daubert* argument, Wielgus asserts that this testimony should be excluded because he says that Domeny's statement is nothing more than speculation. But as far as this court can tell, Domeny's testimony has a similar foundation as Dr. Gass's regarding the costs of incorporating SawStop. Dr. Gass opines that the cost would be between $100 and $150 based on his

36

experience in developing SawStop tools and his tally of the costs of the required component parts. (*See* R. 192, Ex. 3, Gass Report ¶ 57.) Similarly, Domeny's rebuttal opinion rests on his experience and familiarity with the design and manufacturing process involved in power-tool production. (R. 207, Ex. F, Domeny Report at 2.) Having ruled that Dr. Gass's cost hypothesis may come in, this court sees no reason to preclude Domeny's rebuttal testimony at this point. Accordingly, Wielgus's third motion in limine to preclude certain arguments regarding flesh-detection technology is denied without prejudice.

## VII. Plaintiff's Fourth Motion in Limine to Preclude Certain Testimony of Defendants' Expert Domeny

Wielgus's fourth motion in limine is granted in part and denied in part. Through this final motion in the long queue Wielgus seeks to prevent Domeny from: (1) testifying that the blade guard was not on the saw Wielgus was using at the time of his injury; and (2) criticizing Dr. Graham's opinions. In responding to the motion, the defendants have agreed that Domeny will not contradict Wielgus's testimony that the blade guard was on the saw at the time of his accident. And given this court's ruling with respect to Dr. Graham's testimony, Wielgus's request to preclude Domeny from criticizing his opinion is moot. Accordingly, the motion is granted in part to the extent that Domeny will not be permitted to testify that the blade guard was not on the BTS10S at the time of Wielgus's accident. The motion is denied as moot in part with respect to Domeny's critique of Dr. Graham's opinion.

### Conclusion

37

For the foregoing reasons, defendants' motions in limine numbers 4 (R. 171) and 5 (R. 172) are granted in part and denied in part, and their motions in limine numbers 6 (R. 173), 19 (R. 186) and 25 (R. 192) are granted. Wielgus's third motion in limine (R. 207) is denied without prejudice and his fourth motion in limine (R. 209) is granted in part and denied in part.

**ENTER:**

Young B. Kim
United States Magistrate Judge

38